**NOT FOR PUBLICATION**                                                                                **CLOSED**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| LOUIS DIBLASI, | : | |
|       Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. 05-1980 (JAP) |
| BOROUGH OF EAST RUTHERFORD, | : | |
|       Defendant. | : | **OPINION** |

APPEARANCES:

Louis DiBlasi
75 Mozart Street, Apt. 3
East Rutherford, NJ 07073
    Pro Se Plaintiff

Miles Benjamin Neustein, Esq.
William J. Hunt & Associates
155 Polifly Road, Suite 200
Hackensack, NJ 07601-1724
    Attorney for Borough of East Rutherford

PISANO, District Judge.

Plaintiff, Louis DiBlasi, proceeding pro se, brought the instant lawsuit against Defendant, the Borough of East Rutherford (the "Borough") on April 13, 2005.[1] Plaintiff claims that Defendant violated his Fourth Amendment rights under the United States Constitution when its representatives entered properties owned by Plaintiff. He further claims that Defendant violated his Eighth Amendment rights when Defendant subsequently fined Plaintiff for various statutory violations found on Plaintiff's properties. Defendant has filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiff has not filed a response. For the following reasons, the Court grants Defendant's motion for summary judgment.[2]

## I.     Factual History[3]

Plaintiff is the owner of property located at 75 Mozart Street, East Rutherford, New Jersey. This property consists of three attached single-family dwellings, each having a separate entrance. These dwellings are referred to as apartments one, two and three. Plaintiff rented

---

[1] Plaintiff does not name as defendants the three individuals who performed an inspection on his properties on October 25, 2004, namely, Charles F. Flenner, Jr., Dennis E. Monks, and Dennis Taormina. These individuals will be collectively referred to as the "Borough Officials."

[2] This matter is decided without oral argument as permitted by Fed. R. Civ. P. 78. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff has alleged the deprivation of his constitutional rights. Although pro se Plaintiff does not so specify, his claims are properly brought pursuant to 42 U.S.C. § 1983.

[3] The following facts are undisputed. They are compiled from Defendant's Statement of Material Undisputed Facts and the certifications submitted by Charles F. Flenner, Jr., Dennis E. Monks, and Dennis Taormina. Although Plaintiff has not opposed the instant motion for summary judgment, the Court also considered the allegations in Plaintiff's complaint and Plaintiff's testimony at his deposition, which was held on September 27, 2005, December 13, 2005, and April 3, 2006, in drafting the factual history. See, e.g., Colida v. Sharp Elecs. Corp., No. 03-2889, 2004 U.S. Dist. LEXIS 27428, at *1 (D.N.J. Oct. 6, 2004); Jordan v. Allgroup Wheaton, 218 F. Supp. 2d 643, 646 n.2 (D.N.J. 2002).

apartments one and two to multiple third parties. He lived in apartment three.

On or about October 21, 2004, Dennis Taormina, the Borough's Ordinance Enforcement Officer,[4] received a complaint from two persons who identified themselves as tenants residing at 75 Mozart Street. One of the complainants was Jose Miranda. The parties do not provide the name of the second complainant. The tenants complained that Plaintiff did not have operable smoke detectors on the property and that there was exposed wiring in the bathroom.

On October 25, 2004,[5] Mr. Taormina and Dennis E. Monks, the Borough Fire Official,[6] visited the property. Mr. Miranda gave them permission to enter apartment one. Apartment one consisted of three separate bedrooms, each individually rented by Plaintiff on a weekly basis. The three tenants of apartment one shared a common kitchen and bathroom. Mr. Miranda, and a second tenant who was at home, Linda Perkins, invited Mr. Taormina and Mr. Monks to inspect their respective bedrooms. Mr. Monks and Mr. Taormina did not enter the third bedroom. The tenant who occupied this bedroom was not at home at the time.[7]

---

[4] As Ordinance Enforcement Officer, Mr. Taormina is charged with enforcing Borough ordinances with regard to all properties within the Borough.

[5] The parties sometimes refer to this date as "October 25, 2005." This is impossible considering Plaintiff's complaint was filed on April 13, 2005. Thus, the correct date is October 25, 2004.

[6] As Borough Fire Official, Mr. Monks is responsible for enforcing the fire safety code respecting smoke and carbon monoxide detectors and other fire safety issues.

[7] The identity of the third tenant in apartment one is still unclear. Vincent Rucker lived in apartment one at some point, but Plaintiff claimed that he lived in the same room as Linda Perkins. DiBlasi Dep. at 230:18-23. Plaintiff stated in his deposition that the third tenant in apartment one was "Max. Some Italian guy. Like an Italian full name." DiBlasi Dep. at 230:24 - 231:3. It was later determined that "Max" was Missimo Gargulio. DiBlasi Dep. at 237:19-25, 267:21-25.

Mr. Taormina and Mr. Monks noted the following violations of the New Jersey Uniform Fire Code, N.J.A.C. §§ 5:70-1.1 et seq., the New Jersey Uniform Construction Code, N.J.A.C. §§ 5:23-1.1 et seq., and the New Jersey Regulations Governing Rooming and Boarding Houses, N.J.A.C. §§ 5:27-1.1 et seq. during their inspection:

(1) no smoke or carbon monoxide detectors were present in either of the two bedrooms or in the common areas;

(2) exposed wiring above the bathroom vanity;

(3) bedroom doors had "hasp-type" locks;

(4) a new, partially completed wall was erected to form the third bedroom without a construction permit;

(5) Plaintiff was operating apartment one in a "rooming house" fashion by renting each bedroom on a weekly basis under a separate lease for which he did not have the proper certificate of occupancy;[8] and

(6) Plaintiff was purportedly running a business from the apartments' common basement.

Mr. Taormina and Mr. Monks then went to apartment two. All three tenants of apartment two were present, namely, Albert Gibbs, Donnie Blands, and Gregory Kinder. The invited Mr.

---

[8] A rooming house is essentially a building which contains "two or more units of dwelling space intended for single room occupancy, exclusive of any such unit occupied by an owner or operator." N.J.S.A. § 55:13B-3a (defining "boarding house" as "two or more unites of dwelling space intended for single room occupancy, exclusive of any such unit occupied by an owner or operator, and wherein personal or financial services are provided to the residents . . ."); § 55:13B-3h (defining "rooming house" as "a boarding house wherein no personal or financial services are provided to the residents").

Taormina and Mr. Monks into the apartment. Apartment two was designed in the same manner as apartment one, with three separate bedrooms and a common area. The tenants in apartment two informed Mr. Taormina and Mr. Monks that, similar to the tenants in apartment one, they each rented a bedroom under a separate lease with Plaintiff and paid weekly rent. They also said that Plaintiff resided in apartment three. Mr. Monks and Mr. Taormina noticed that apartment two had a smoke detector, but no carbon monoxide detector.

After examining apartment two, Mr. Taormina and Mr. Monks called Charles F. Flenner, Jr., the Borough Construction Official.[9] Mr. Flenner arrived at the property. Mr. Taormina and Mr. Monks advised Mr. Flenner of their findings. Mr. Flenner inspected apartments one and two after being invited in by their respective tenants. Again, Mr. Flenner did not enter the third bedroom in apartment one, whose tenant was not at home.

The Borough Officials then rang the bell of apartment three. Plaintiff appeared at the door and invited them in. They advised Plaintiff that he was operating illegal rooming houses in apartments one and two, and that he was required to have smoke and carbon monoxide detectors in each apartment pursuant to the New Jersey Uniform Fire Code.

The Borough Officials then asked Plaintiff if they could inspect his basement. Plaintiff consented and accompanied them to the basement. In the basement, Mr. Flenner, Mr. Taormina, and Mr. Monks found another wall that had been constructed without a permit. They asked Plaintiff if they could inspect behind the wall. Plaintiff consented. Behind the wall, the officials found an inventory of clothing which Plaintiff apparently sold as part of his business. They

---

[9] As Borough Construction Official, Mr. Flenner was responsible for enforcing the New Jersey Uniform Construction Code and other building and construction matters in the Borough.

advised Plaintiff that he violated zoning regulations by operating a business from his home.

Subsequently, the Borough Officials told Plaintiff that if he installed the requisite smoke and carbon monoxide detectors, he would not be fined for such violation of the fire code. Plaintiff installed the smoke and carbon monoxide detectors. Further, Mr. Miranda removed the "hasp-type" locks, which were also a fire code violation, and returned the locks to Plaintiff.

It appears that Plaintiff then accompanied the Borough Officials to Plaintiff's other rental property, located at 11 Windsor Avenue, East Rutherford, New Jersey. One of the tenants at 11 Windsor Avenue, Juanita Pardo, answered the door and let Plaintiff and the Borough Officials into unit one. Another tenant, who was not identified, let the group into unit three. No citations or violations notices were issued with respect to 11 Windsor Avenue.

The Borough thereafter issued three forms of process to Plaintiff as a result of their inspection of the three apartments at 75 Mozart Street. First, they issued a Stop Work Order prohibiting him from doing further work on the new walls which were constructed without a permit. The Stop Work Order carried a fine of $500.00 per day if not observed. The Borough informed Plaintiff that if he obtained a permit to remove the walls in question, the fine would be reduced. Plaintiff obtained the requisite permit and removed the walls. The Borough waived the fine under the Stop Work Order.

The Borough also issued two violations.[10] The first was for Plaintiff's failure to obtain a permit before constructing the walls in question. The second was for Plaintiff's failure to obtain

---

[10] These documents are violations nos. 20040052/0 and 20040053/0. According to Defendant, Plaintiff violated various provisions of the New Jersey Uniform Construction Code, N.J.A.C. §§ 5:23-1.1 et seq. and the New Jersey Regulations Governing Rooming and Boarding Houses, N.J.A.C. §§ 5:27-1.1 et seq.

a certificate of occupancy before maintaining apartments in a rooming house fashion and operating a business from his basement.  Each of these two violations carried an initial fine of $500.00 for the first three weeks while the violation remained uncorrected and the potential of a $500.00 per week fine thereafter.[11]

Plaintiff was advised that he could appeal the Borough's actions to the County Construction Board of Appeals within fifteen days.  Plaintiff retained counsel and filed such appeal.  On or about February 9, 2005, while the appeal was pending, Mr. Flenner met with Plaintiff and Plaintiff's attorney.  At this meeting, Plaintiff claimed he was removing the offending walls.  He also stated that he would obtain group leases from his tenants, thus, remedying the violation for maintaining an improper rooming house.  Mr. Flenner stated in his certification that he believed that Plaintiff's appeal was rejected on November 18, 2004 for being incomplete.  He did not believe that Plaintiff re-filed his application for appeal within the applicable time limits.

Plaintiff eventually remedied the violations discussed above.  However, Plaintiff failed to pay the initial fines of $500.00 for each of the two violations issued by the Borough.  Because of his failure to pay, interest and penalties on each fine has accumulated.  Plaintiff now owes the Borough approximately $9,214.29 for each violation.  According to the Court's calculation, this

---

[11] The Borough was required to report Plaintiff's operation of a rooming house to the New Jersey Department of Community Affairs (the "Department").  A plenary hearing was scheduled for April 2006.  Plaintiff failed to appear.  The Department fined Plaintiff $5,000.00.  This fine is not the subject of the instant complaint as the Department is not named as a defendant.  To the extent Plaintiff is claiming that the Borough somehow influenced the Department to impose this fine upon Plaintiff, this bald allegations is wholly speculative and thus, is rejected.

represents a total fine of $18,428.58.[12] Mr. Flenner states that on or about March 21, 2005, he offered Plaintiff a reduction of the fines due to his compliance. Mr. Flenner told Plaintiff the matter would be settled if he paid the initial fine of $1,000.00, representing $500.00 for each violation. Plaintiff purportedly asked Mr. Flenner if he would accept two payments of $500.00 each, to which Mr. Flenner agreed. Plaintiff never paid the fine.[13]

Plaintiff now claims that the Borough violated his rights under the Fourth Amendment to the United States Constitution by unlawfully entering his property on October 25, 2004. He further claims that the fines imposed by the Borough are excessive under the Eighth Amendment.[14] It appears that Plaintiff believes that Borough Officials entered his property and

---

[12] There appears to be a discrepancy as to whether the accrued interest and penalties total $9,214.29 or whether each of the two fines has accrued interest and penalties of $9,214.29 for a total of $18,428.58. See DiBlasi Dep. at 176:6 - 178:5, 64:4 -15; Flenner Cert. at ¶ 16. In any event, any such discrepancy is immaterial to the disposition of this motion.

[13] Plaintiff claims in his complaint that Mr. Flenner told him that his fines as of March 25, 2005 were "well over $40,000.00." He stated in his deposition that Mr. Flenner told him that his fines were "up near $45,000.00." DiBlasi Dep. at 18:24 - 20:10. Plaintiff provides no evidence to support this assertion. Further, any dispute as to whether Mr. Flenner told DiBlasi that his fines were "well over $40,000.00" or "up near $45,000.00" is immaterial. Even if Mr. Flenner told Plaintiff this information, it is clear from the record that Plaintiff was never actually fined more than $18,428.58. DiBlasi Dep. at 62:20 - 65:2. This fine represents the two initial $500 fines plus the interests and penalties which have accumulated because of Plaintiff's failure to pay. This fine of course, does not represent any interest or penalties that have occurred since the filing of the instant motion.

[14] Although in characterizing his Eighth Amendment claim, Plaintiff alleges that the fines imposed by Defendant constitute cruel and unusual punishment and excessive fines under the Eighth Amendment, the Court applies only the Excessive Fines Clause. The Supreme Court has stated that the "Cruel and Unusual Punishments Clause is self-evidently concerned with punishment" while the "Excessive Fines Clause limits the government's power to extract payments, whether in case or in kind, 'as *punishment* for some offense.' " Austin v. United States, 509 U.S. 602, 609-10 (1993) (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265 (1989)); see also United States v. Bajakajian, 524 U.S. 321, 328 (1998) (stating that the Excessive Fines Clause limits the government's power to extract

fined him in retaliation for a claim he filed against the Borough for back taxes. Plaintiff asserts that this claim was found in his favor. According to Plaintiff, Mr. Monks's office is near the desk of the "tax person," whom he identifies as "Linda C. Ramsaier." See Complaint at p.2; DiBlasi Dep. at 21:11 - 23:22.

Plaintiff claims that before Borough Officials entered his home on October 25, 2004, he was "living large." DiBlasi Dep. at 288:22. He seeks as relief the resignation of Mr. Flenner and Mr. Monks and $5,000,000.00 for monies lost and emotional turmoil. As to monies lost, Plaintiff claims that the Borough's fines may force his house into foreclosure and have resulted in a loss of rental income.

## II.  Standard of Review

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are critical or "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue

---

payments as punishment for some offense). The only punishment that Plaintiff alleges the Borough imposed on him was monetary fines. Plaintiff's allegations of "threats of imprisonment" are wholly unsupported by the record. Thus, the Court construes Plaintiff's claim under the Excessive Fines Clause of the Eighth Amendment. To the extent Plaintiff asserts a cruel and unusual punishment claim, such must be dismissed because he provides no evidence of any such punishment.

of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to present evidence that a genuine, fact issue compels a trial.  Id. at 324.  In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings.  See Celotex, 477 U.S. at 324.

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party.  Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  Anderson, 477 U.S. at 249.  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  Big Apple BMW v. BMW of North America, 974 F.2d 1358, 1363 (3d Cir. 1992).   In fact, the Supreme Court has specifically emphasized that a principal purpose of the summary judgment rule "is to isolate and dispose of factually unsupportable claims or defenses."  Celotex, 477 U.S. at 323-24.

## III.  Legal Discussion

Plaintiff's claim that Defendant violated his Fourth and Eighth Amendment rights is properly characterized as a claim brought pursuant to 42 U.S.C. § 1983.[15]  Section 1983 is not a

---

[15]  Section 1983 states in relevant part: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." 42

source of substantive rights, but provides a cause of action against state actors for a violation of rights created by the United States Constitution or federal law. See Graham v. Connor, 490 U.S. 386, 393-94 (1989); Morse v. Lower Merion School Dist., 132 F.3d 902, 907 (3d Cir. 1997). Thus, Plaintiff's claim is essentially that Defendant violated section 1983 by infringing upon his Fourth and Eighth Amendment rights.

A municipality, such as the Borough, may be held liable under section 1983 where a plaintiff demonstrates that his constitutional rights were either violated by the municipality itself or violated by municipal employees acting pursuant to a policy of custom of the municipality. See Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000); Baker v. Monroe Twp., 50 F.3d 1186, 1191 (3d Cir. 1995).

**A.     Fourth Amendment**

Plaintiff claims that the Borough violated his Fourth Amendment right to be free from unreasonable searches and seizures when its representatives entered his properties at 75 Mozart Street and 11 Windsor Avenue on October 25, 2004.[16] The Court finds that Plaintiff's Fourth Amendment claim fails for the following three reasons.

First, Borough employees, namely, Mr. Flenner, Mr. Monks, and Mr. Taormina, not the Borough itself, entered Plaintiff's properties. Thus, the Borough, who is the only named defendant in this action, cannot be held liable under section 1983 for the unconstitutional acts of

---

U.S.C. § 1983.

[16] The Fourth Amendment states: "[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

its employees unless Plaintiff demonstrates that his rights were violated by a policy or custom of the Borough.  See Berg, 219 F.3d at 275; see also Baker, 50 F.3d at 1194 (3d Cir. 1995) (granting motion for summary judgment in favor of township on section 1983 claim where plaintiff failed to show policy of custom of the township which violated plaintiff's constitutional rights).

Although the parties fail to brief this issue, Plaintiff's Fourth Amendment claim runs afoul of this principal because Plaintiff does not allege any unconstitutional acts, policies, or customs on the part of the Borough.  Instead, Plaintiff claims that Borough employees — Mr. Flenner, Mr. Monks, and Mr. Taormina — violated his Fourth Amendment rights.  Thus, Plaintiff cannot establish a section 1983 claim based on a violation of the Fourth Amendment by the Borough.

Second, although this point also was not raised by the parties, the Court finds *sua sponte* that Plaintiff lacks standing to assert Fourth Amendment claims with respect to properties owned by Plaintiff in which he did not reside.  See Addiction Specialists, Inc. v. Township of Hampton, 411 F.3d 399, 405 (3d Cir. 2005) ("we are required to raise issues of standing *sua sponte* if such issues exist").  Specifically, Plaintiff lacks standing to assert a Fourth Amendment claim as to apartments one and two at 75 Mozart Street and as to the apartments at 11 Windsor Avenue.

Property ownership alone is insufficient to confer standing to contest a search under the Fourth Amendment.  See, e.g., Georgia v. Randolph, 126 S. Ct. 1515, 1521 (2006) ("Fourth Amendment rights are not limited by the law of property."); Godshalk v. Borough of Bangor, No. Civ.A. 03-1465, 2004 WL 999546, at *10 (E.D. Pa. May 5, 2004) ("ownership alone is insufficient to confer standing to contest a search").  Instead, a plaintiff must show that he had a reasonable or legitimate expectation of privacy in the premises searched.  See, e.g., United States

v. Baker, 221 F.3d 438, 441 (3d Cir. 2000) ("Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched . . . and that he manifest a subjective expectation of privacy in the property searched . . . ." (internal citations omitted)); Godshalk, 2004 WL 999546, at *10 ("To assert a violation of the Fourth Amendment, as plaintiffs attempt to do, one must first demonstrate a "legitimate expectation of privacy" in the area searched.").

Plaintiff fails to show that he had a reasonable expectation of privacy in any of the apartments inspected except apartment three. He did not reside at apartments one or two at 75 Mozart Street or at 11 Windsor Avenue. Plaintiff has provided no evidence, besides his bare legal ownership of these premises, that he maintained a legitimate expectation of privacy in any of these residences.[17] Thus, Plaintiff lacks standing to challenge the Borough Officials' inspections of these properties. See Godshalk, 2004 WL 999546, at *10 (holding that plaintiffs lacked standing to challenge borough officer's inspection of plaintiffs' property for building code violations because plaintiffs were mere legal owners of the property and did not reside at the property); see also Shamaeizadeh v. Cunigan, 338 F.3d 535, 544-45 (6th Cir. 2003) (holding that property owner who lived in one story house with a basement lacked standing to contest search of basement which he rented to two tenants because he did not have a reasonable expectation of

---

[17] It appears that apartments one, two, and three at 75 Mozart Street shared a common basement. Monks Cert. at ¶ 7; Taormina Cert. at ¶ 8. Plaintiff does not have a reasonable expectation of privacy in the bedrooms rented by his tenants or in the kitchen and bathroom shared by his respective tenants in his apartments at 75 Mozart Street by virtue of the fact that the apartments shared a common basement. If anything, his use of the basement gives him a reasonable expectation of privacy in the basement, the search of which Plaintiff consented to himself. See DiBlasi Dep. at 34:6-9, 37:2-3, 108:5-8, 232:18 - 233:1; Flenner Cert. at ¶ 8; Monks Cert. at ¶ 14; Taormina Cert. at ¶ 14.

privacy in basement); Rozman v. City of Columbia Heights, 268 F.3d 588, 591 (8th Cir. 2001) (holding that landlord lacked standing to assert tenant's Fourth Amendment rights).

Even if Plaintiff did have standing to challenge the inspections of these properties, it is clear that no Fourth Amendment violation occurred because the respective tenants at these residences gave consent for the Borough Officials to enter the property. A search is per se unreasonable under the Fourth Amendment if conducted without a warrant issued upon probable cause. See United States v. Lockett, 406 F.3d 207, 211 (3d Cir. 2005) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). However, one of the well-established exceptions to this rule is that a search conducted pursuant to voluntary consent is reasonable and thus, valid. See id. Consent must be voluntary, but need not be knowing or intelligent. See id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973)). Thus, an individual may give valid consent even if unintentional and even if the individual does not know that he or she has the right to refuse such consent. See id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973)).

Both an individual whose property is searched and a third party who possesses common authority over the premises may consent to a search of the premises.[18] See Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (indicating that consent is sufficient when given by an individual who has or reasonably appears to have common authority over a premises but in fact has no property interest in the premises searched). The United States Supreme Court has made clear that:

---

[18] This statement is made with the following caveat. A property owner generally may not consent to the search of an apartment or other rental unit leased to a tenant. See Chapman v. United States, 365 U.S. 610, 616-17 (1961); see also United States v. Lin, No. 03-2054, 131 Fed. Appx. 884, 885 (3d Cir. May 24, 2005) ("Generally, landlords cannot consent to the warrantless search of their tenants' quarters."). This principle does not apply here because Plaintiff did not give consent to search the units occupied by his tenants. The tenants themselves gave consent.

> [c]ommon authority is . . . not to be implied from the mere property interest a third party has in the property. . . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

United States v. Matlock, 415 U.S. 164, 172 n.7 (1974).

There is no dispute that the Borough Officials had consent to enter apartments one and two at 75 Mozart Street and the common areas of such apartments. Mr. Monks and Mr. Taormina certified that Jose Miranda and Linda Perkins, tenants of apartment one, gave their consent to search the common areas and their two bedrooms. Monks Cert. at ¶ 3-4; Taormina Cert. at ¶ 4-5. As residents, these individuals clearly had the requisite authority to consent to an inspection of their own bedrooms and common authority to consent to the inspection of the common kitchen and bathroom areas. The officials did not enter the third bedroom in apartment one because the tenant who resided there was not at home. Monks Cert. at ¶ 6; Taormina Cert. at ¶ 7. All three tenants in apartment two invited the Borough Officials to inspect the apartment. Monks Cert. at ¶ 9; Taormina Cert. at ¶ 10. Again, as residents, these individuals also had the requisite authority to consent to the inspections performed. Mr. Flenner, Mr. Monks, and Mr. Taormina certified that when they re-entered apartments one and two after Mr. Flenner arrived, these same tenants gave consent to their entry. Flenner Cert. at ¶ 5; Monks Cert. at ¶ 12; Taormina Cert. at ¶ 12. Plaintiff has offered no specific facts or other evidence to refute their assertions.[19]

---

[19] Plaintiff admits that he was not present during the inspections of apartments one and two at 75 Mozart Street. DiBlasi Dep. at 107:3-20

There is also no dispute that the Borough Officials had consent to enter units one and three at 11 Windsor Avenue, which appear to be the only units they entered. There is no evidence in the record that the Borough Officials entered unit two. Plaintiff himself, who was present for the inspection of 11 Windsor Avenue, did not object to this inspection at the time. Further, he admits that his tenants in units one and three gave the group permission to enter their units.[20]  DiBlasi Dep. at 42:15 - 43:23. Again, as tenants, these individuals possessed the authority to consent to the inspection of their respective units.

With respect to apartment three, Plaintiff's residence, it is undisputed that Plaintiff himself gave the officials permission to enter the apartment. See DiBlasi Dep. at 34:6-9, 37:2-3, 107:21 - 108:8; 221:15 - 222:10, 232:18 - 233:1; Flenner Cert. at ¶ 7-8; Monks Cert. at ¶ 13-14; Taormina Cert. at ¶ 13-14. Of course, as the property owner and resident, Plaintiff had the authority to consent to the search of apartment three. Plaintiff appears to claim in his deposition that he only gave the Borough Officials consent to look for smoke detectors and not consent to further search his apartment. DiBlasi Dep. at 221:20 - 222:10. This argument is nonsensical. In order to determine whether Plaintiff had the proper smoke detectors, they had to examine the rooms in his apartment.

Thus, the Court grants summary judgment in favor of Defendant on Plaintiff's section 1983 claim predicated on a violation of the Fourth Amendment.

---

[20] Plaintiff states in his deposition that the tenant in unit three, who is unidentified, spoke Spanish. DiBlasi Dep. at 43:14:20. Plaintiff speculated that the tenant did not understand the purpose of the inspection when she allowed them to enter. DiBlasi Dep. at 43:18:23. Plaintiff has provided no evidence to support his assertion. Further, as indicated above, to the extent that this unidentified tenant's Fourth Amendment rights were violated by the Borough Officials, Plaintiff has no standing to assert such a claim in this lawsuit.

**B.      Eighth Amendment**

Plaintiff asserts that the Borough violated his Eighth Amendment[21] right to be free from excessive fines by fining him for his multiple fire code and statutory violations.[22] The Excessive Fines Clause " 'limits the government's power to extract payments, whether in cash or in kind, "as *punishment* for some offense.' " United States v. Bajakajian, 524 U.S. 321, 328 (1998) (quoting Austin v. United States, 509 U.S. 602, 609-10 (1993)). The relevant inquiry under the Excessive Fines Clause is whether the fine imposed is proportionate to the gravity of the offense it is designed to punish. See id. at 334-35, 339-40 (holding that forfeiture of $357,144.00 from plaintiff was grossly disproportionate under the Excessive Fines Clause to gravity of offense of failing to report that he was transporting more than $10,000.00 of exported currency). The Eighth Amendment prohibits the imposition of fines that are grossly disproportionate to the severity of the offense. See, e.g., id. at 334; Negron v. Grace, No. 05-2207, 2006 WL 1455723, at *5-7 (M.D. Pa. 2006).

The fines imposed upon Plaintiff by the Borough do not violate the Excessive Fines Clause. Under the two violations issued, Plaintiff was fined $500.00 per violation for the first three weeks while the violation remained uncorrected with the potential of a $500.00 per week fine thereafter. The purpose of these fines is clearly punitive and not remedial. The fines punish individuals for violations of the fire safety code and other statutory provisions which

---

[21] The Eighth Amendment states: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII.

[22] Since Plaintiff alleges that the Borough itself imposed fines upon Plaintiff, and Defendant does not argue otherwise, the Court presumes that the Borough, as a municipality, is subject to section 1983 liability on Plaintiff's Eighth Amendment claim.

protect the health and safety of Borough residents.  The Borough actually waived the potential fines for Plaintiff's lack of smoke and carbon monoxide detectors and determined not to levy a fine under the Stop Work Order.  Plaintiff provides no support for his bald assertion that two $500 fines in light of his multiple offenses was excessive under the dictates of the Eighth Amendment.

Accordingly, the Court finds that the two $500.00 fines imposed upon Plaintiff by the Borough for his multiple statutory violations were not grossly disproportionate to the severity of his offenses.  See Towers v. City of Chicago, 173 F.3d 619, 625-26 (7th Cir. 1999) (holding that $500.00 fine imposed on owners of vehicles found to contain contraband was "not so large as to be grossly out of proportion to the activity that the City is seeking to deter").  Thus, the fines do not violate the Excessive Fines Clause.

To the extent that those fines grew with time due to the accumulation of interest and penalties, this was Plaintiff's own fault for failing to make the requisite payment.  Cf. State of New Jersey v. Schad, 733 A.2d 1159, 1173-74 (N.J. 1999) (holding that fine of $500.00 per day for violation of municipal ordinance which grew to $95,920.00 based on plaintiff's continuous violations of ordinance was not unconstitutionally excessive).

**IV.   Conclusion**

Thus, for the foregoing reasons, the Court grants Defendant's motion for summary judgment.  This matter is hereby closed.  An appropriate order accompanies this opinion.

Date:   August 3, 2006                                              /s/ JOEL A. PISANO
                                                                    United States District Judge

Original:       Clerk
cc:             Judge Arleo, All Parties, File